J-S37019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DIMAS OMAR HERNANDEZ | : | |
| | : | |
| Appellant | : | No. 2143 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 29, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002050-2020

BEFORE: BOWES, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.: **FILED NOVEMBER 19, 2024**

Dimas Omar Hernandez (Appellant) appeals from the judgment of sentence imposed for his jury convictions of two counts each of involuntary servitude, involuntary deviate sexual intercourse (IDSI), sexual assault, and terroristic threats; and one count each of corrupt organizations, trafficking in minors, criminal conspiracy (trafficking in minors), trafficking in individuals, rape by forcible compulsion, kidnapping to facilitate a felony, kidnapping of a minor, unlawful restraint, unlawful restraint of a minor (involuntary servitude), and sexual exploitation of children.[1] Appellant's counsel, Scott J. Werner, Jr., Esquire (Counsel), has filed a petition to withdraw from his

---

[1] **See** 18 Pa.C.S.A. §§ 3012(a), 3123(a)(1), 3124.1, 2706(a)(1), 911(b)(3), 3011(b), 903, 3011(a)(1), 3121(a)(1), 2901(a)(2), 2901(a.1)(2), 2902(a)(2), 2902(b)(2), 6320(a).

representation of Appellant, and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After careful review, we grant Counsel's petition to withdraw and affirm Appellant's judgment of sentence.

In May 2020, the Malvern Pennsylvania Police Department received a report regarding the possible endangerment of A.M., a 14-year-old Maryland girl. On May 28, 2020, A.M.'s mother contacted East Whiteland Township Police Sergeant Patricia Doyle (Sgt. Doyle) and indicated that A.M. might be found at a local Pennsylvania Wawa convenience store (Wawa) at 1:00 a.m.

During her surveillance of the Wawa, at around 1:20 a.m., Sgt. Doyle observed an SUV driving behind the Wawa. Once the SUV parked behind the Wawa, Sgt. Doyle saw a girl exit the SUV. The girl was dressed inappropriately for the weather. At Sgt. Doyle's request, the girl, A.M., entered Sgt. Doyle's police vehicle.

Police subsequently discovered that A.M. and another young woman, E.A., had been involuntarily held and forced to engage in sexual activities with paying customers. Police discovered that three men were engaged in the operation: Appellant, Franklin Eduardo Rivera-Mendieta (Rivera-Mendieta), and Josue Sibrian Sanchez (Sanchez).

Relevant to this appeal, following a jury trial of Appellant and Rivera-Mendieta, Appellant was convicted of the above-described charges. Before sentencing, the trial court ordered the preparation of a presentence

investigation report. On November 29, 2022, the trial court sentenced Appellant to an aggregate prison term of 35-70 years, with credit for time served from June 4, 2020, through November 29, 2022.[2] Appellant filed a timely post-sentence motion, which the trial court denied on March 13, 2023. Throughout trial and post-sentence motions, Ryan Hyde, Esquire (Attorney Hyde), represented Appellant.

On July 24, 2023, Appellant filed a *pro se* petition for allowance of direct appeal *nunc pro tunc*.[3] On July 27, 2023, the PCRA court granted the petition, and permitted Appellant to file the instant direct appeal, *nunc pro tunc*.

Relevantly, on July 31, 2023, the trial court appointed Thomas Patrick McCabe, Esquire (Attorney McCabe), to represent Appellant. On November 29, 2029, in lieu of a court-ordered Pa.R.A.P. 1925(b) concise statement of issues for appeal, Attorney McCabe filed a statement of his intention to file a petition to withdraw from representation and an ***Anders*** brief. ***See*** Pa.R.A.P. 1925(c)(4).

---

[2] Appellant was found to be a sexually violent predator.

[3] We consider Appellant's petition as a petition for relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. ***See Commonwealth v. Fowler***, 930 A.2d 586, 591 (Pa. Super. 2007) ("It is [] well-settled that the PCRA provides the sole means for obtaining collateral review, and that any petition filed after the judgment of sentence becomes final will be treated as a PCRA Petition.") (citation and quotation marks omitted).

Attorney McCabe filed in this Court a petition to withdraw from representation and an ***Anders*** Brief. However, because of Attorney McCabe's election to the Chester County Court of Common Pleas, the trial court granted Attorney McCabe leave to withdraw and appointed Counsel to represent Appellant in this appeal. On February 8, 2024, Counsel filed in this Court a petition to withdraw from representation and an ***Anders*** brief.

On July 19, 2024, Appellant filed a *pro se* motion for compulsory disclosure, discovery and inspection pursuant to Pa.R.Crim.P. 573. ***See*** Pa.R.Crim.P. 573 (Pretrial Discovery and Inspection). On August 22, 2024, this Court directed the trial court to provide the requested information to Appellant and/or his counsel. Order, 8/22/24. The trial court complied. On October 14, 2024, the trial court filed a statement indicating that Counsel certified his compliance with the trial court's directive. Trial Court Statement, 10/14/24, at 1.

Initially, we observe the following: "When presented with an ***Anders*** brief, this Court may not review the merits of the underlying issue without first passing on the request to withdraw." ***Commonwealth v. Garang***, 9 A.3d 237, 240 (Pa. Super. 2010) (citation omitted). Counsel seeking to withdraw from representation must

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the defendant; and 3) advise the defendant that he ... has the right to retain private counsel or raise additional

arguments that the defendant deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*). Pursuant to *Santiago*, counsel must also

> (1) [p]rovide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (citing *Santiago*, 978 A.2d at 361). Once counsel has complied with these procedural requirements, we review the record and render an independent judgment as to whether the appeal is wholly frivolous. *Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Our review discloses Counsel properly notified Appellant of Counsel's intention to withdraw, and of Appellant's right to secure new counsel or raise additional arguments *pro se*. The record further reflects Counsel furnished Appellant with copies of his petition to withdraw and *Anders* brief. The *Anders* brief summarizes the history of this appeal, and explains Counsel's reasons for concluding that the appeal is wholly frivolous. As Counsel has satisfied the procedural requirements of *Anders* and *Santiago*, we next review the record to determine whether Appellant's appeal is wholly frivolous.

Counsel's ***Anders*** Brief asserts the following issue in the statement of questions involved: "Are there any non-frivolous issues preserved on appeal?" ***Anders*** Brief at 4 (capitalization modified). In the argument section of the ***Anders*** brief, counsel addresses issues challenging the sufficiency and weight of the evidence underlying the verdicts, and a challenge to the discretionary aspects of Appellant's sentence. ***See id.*** at 16-20. Counsel concludes these issues lack merit and are frivolous. ***Id.*** at 18, 20. Our review confirms Counsel's conclusions.

Regarding a challenge to the sufficiency of the evidence, our standard of review is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

***Commonwealth v. Juray***, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted).

Appellant was convicted of two counts of involuntary servitude. Crimes Code Section 3012 provides:

> **(a) Offense defined. —** A person commits a felony of the first degree if the person knowingly, through any of the means described in subsection (b), subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter.

**(b) Means of subjecting an individual to involuntary servitude. —** A person may subject an individual to involuntary servitude through any of the following means:

**(1)** Causing or threatening to cause serious harm to any individual.

**(2)** Physically restraining or threatening to physically restrain another individual.

**(3)** Kidnapping or attempting to kidnap any individual.

….

**(5)** Taking or retaining the individual's personal property or real property as a means of coercion.

**(6)** Engaging in unlawful conduct with respect to documents, as defined in section 3014 (relating to unlawful conduct regarding documents).

….

**(9)** Criminal coercion, as defined in section 2906 (relating to criminal coercion).

**(10)** Duress, through the use of or threat to use unlawful force against the person or another.

**(11)** Debt coercion.

**(12)** Facilitating or controlling the individual's access to a controlled substance.

**(13)** Using any scheme, plan or pattern intended to cause the individual to believe that, if the individual does not perform the labor, services, acts or performances, that individual or another individual will suffer serious harm or physical restraint.

18 Pa.C.S.A. § 3012.

Appellant also was convicted of two counts of IDSI.  The Crimes Code

defines the crime of IDSI, in relevant part, as follows:

> **(a)  Offense defined.—**A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant:
>
> > **(1)**    by forcible compulsion ….

*Id.* § 3123(a)(1).  IDSI requires that the defendant have committed "deviate

sexual intercourse," which is defined as follows:

> Subject to additional definitions contained in subsequent provisions of this chapter, the following words and phrases when used in this chapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:
>
> * * *
>
> *"Deviate sexual intercourse."*—Sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal.  The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures.

*Id.* § 3101.  "Sexual intercourse," in addition to its ordinary meaning, includes

intercourse  per *os* or  per *anus*,  with  some  penetration  however  slight;

emission is not required.  *Id.*  Both definitions require "some penetration,

however  slight"  of  a  complainant's  body.  *Id.*; *Commonwealth  v.*

*Poindexter*, 646 A.2d 1211, 1215 (Pa. Super. 1994).  Thus, to sustain a

conviction for IDSI, the Commonwealth must establish that the perpetrator

engaged in acts of oral or anal intercourse, which involved some penetration,

however slight.  *Poindexter*, 646 A.2d at 1215.

Regarding Appellant's two convictions of sexual assault, the Crimes Code provides,

> a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

18 Pa.C.S.A. § 3124.1.

Regarding Appellant's two convictions of terroristic threats, a person commits the crime of terroristic threats "if the person communicates, either directly or indirectly, a threat to … commit any crime of violence with intent to terrorize another[.]" *Id.* § 2706(a)(1).

Appellant was convicted of one count each of the following offenses defined below. The Crimes Code defines the crime of corrupt organizations, in part, as follows:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

*Id.* § 911(b)(3). Section 911 provides that racketeering activity includes crimes related to human trafficking. *Id.* § 911(h)(1)(i).

The crimes of trafficking in individuals and trafficking in minors are defined by the Crimes Code as follows:

> **(a) Offense defined.** A person commits a felony:
>
> **(1)** of the first degree if the person recruits, entices, solicits, patronizes, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;

- 9 -

….

**(b) Trafficking in minors.** Notwithstanding section 1103 (relating to sentence of imprisonment for felony), a person shall be sentenced to a term of imprisonment fixed by the court at not more than 40 years if:

**(1)** the person violates subsection (a)(1) or (2); and

**(2)** the violation:

**(i)** results in a minor being subjected to sexual servitude; and

**(ii)** is part of a course of conduct subjecting minors to sexual servitude.

*Id.* § 3011(a)(1), (b)(1)-(2).

A person is guilty of criminal conspiracy

with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

**(1)** agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

**(2)** agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

*Id.* § 903(a).

Regarding the crime of rape, the Crimes Code provides as follows: "A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant …[b]y forcible compulsion." *Id.* § 3121(a)(1).

The Crimes Code defines the crimes of kidnapping and kidnapping of a minor under Section 2901, which provides, in relevant part, as follows:

> **(a) Offense defined.—** Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>
> ….
>
> > **(2)** To facilitate commission of any felony or flight thereafter.
>
> ….
>
> **(a.1) Kidnapping of a minor.** — A person is guilty of kidnapping of a minor if he unlawfully removes a person under 18 years of age a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines a person under 18 years of age for a substantial period in a place of isolation, with any of the following intentions:
>
> ….
>
> > **(2)** To facilitate commission of any felony or flight thereafter.

*Id.* § 2901(a)(2), (a.1)(2).

The crime of unlawful restraint is defined as follows: "[A] person commits a misdemeanor of the first degree if he knowingly… holds another in a condition of involuntary servitude." *Id.* § 2902(a)(2). The crime of unlawful restraint of a minor is defined as follows:

> **Unlawful restraint of a minor where offender is not victim's parent. —** If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if he knowingly:
>
> ….

- 11 -

**(2)** holds another in a condition of involuntary servitude.

18 Pa.C.S.A. § 2902(b)(2).

Finally, a person commits the offense of sexual exploitation of children "if he procures for another person a child under 18 years of age for the purpose of sexual exploitation." *Id.* § 6320(a).

With these definitions in mind, we review the evidence presented at trial, in a light most favorable to the Commonwealth as verdict winner. Fairfax County, Virginia, Police Officer Chase Briggs (Officer Briggs) testified that on May 17, 2020, he was assigned as a school resource officer. N.T., 8/16/21, at 206-07. At around 2:30 p.m., Officer Briggs received a call from a young lady (the confidential informant or CI), who reported

> that a friend of hers had been sending her some text messages that she was concerned about, and she wanted a police officer to do some sort of follow up with that. … [T]his [was] at the very beginning of the [] COVID pandemic, so a supervisor designated the call to be handled over the phone. So I then called the [CI]….

*Id.* Officer Briggs testified that he knew the CI was a minor. *Id.* at 208. He continued:

> I questioned [the CI] as to why she had been contacting the police and what made her so worried to the point that she contacted the police to have her friend checked on.

*Id.* The CI provided Officer Briggs with A.M.'s phone number and location. *Id.* at 209-10.

> As a result of this information, Officer Briggs

> put that location into Google[ ]Maps, looked up what township or county it was up [] in Pennsylvania. And then based on the other

- 12 -

information that I was given by the [CI], … I felt that … a welfare check was necessary to be done on the [] party that [the CI] … called in about.

….

… I know the location was in … Malvern, Pennsylvania.  So it was the jurisdiction of the police department that covers Malvern, Pennsylvania.

*Id.* at 210.  According to Officer Briggs,

I spoke to a [local Pennsylvania] patrol officer that day about the department going out to do a welfare check, and then I spoke to that same officer after the welfare check was attempted.

*Id.* at 214.  Officer Briggs testified that he

wrote up my report, and I sent a copy over to our gang intelligence unit.  … I provided them with that information about that report that I had just taken.

*Id.*

Sgt. Doyle testified that she conducted the requested welfare check.

Sgt. Doyle reviewed the GPS location "pin drop" provided from the potential

victim's phone.  *Id.* at 224.  She explained:

Within our patrolman's report was information of a pin drop, which means, essentially, if you have the location services [feature activated] … on your phone, … you can show people where you are.  … You can pinpoint on a map – and that is why they call it a pin drop.  It shows … a little red pin on a map….

*Id.* at 224-25.  Sgt. Doyle continued:

So that particular street address is a little strip mall, and there's a car rental place in there, as well as a nail shop, a restaurant, and, I think, a mattress store.

….

> There's a house, essentially, in a parking lot[ of] a car dealership.
> And then … sort of diagonally, there is a trailer park that has about
> 70 trailers in it.

*Id.* at 225. According to Sgt. Doyle, the "pin drop" was at either 486 or 487 Lancaster Avenue, in close proximity to the car rental business. *Id.* at 226-27. Sgt. Doyle confirmed that the house at that address is divided into separate residential units. *Id.* at 227.

> Sgt. Doyle testified that,

> because of the information I received in the police report that I
> read, there was an allegation of some gang … affiliation with this
> person we were looking for, so I had an associate at the time who
> specialized in gangs, and he was an agent for Homeland Security.
> So I called him.

*Id.* at 228. Sgt. Doyle additionally learned that "the person we were looking for, the person that dropped this pin[,] was a child by the name of [A.M.]" *Id.* at 229. At that time (May 2020), A.M. was 14 years old. *Id.* at 230-31.

On May 28, 2020, A.M.'s mother contacted Sgt. Doyle. *Id.* at 234. As a result of information received from A.M.'s mother, Sgt. Doyle contacted Homeland Security Agent Craig.[4] *Id.* According to Sgt. Doyle,

> I contacted Agent Craig from Homeland Security, and I said, let's
> meet at the Wawa … at midnight[,] because I think [A.M.] is going
> to be coming there at 1 a.m. … I didn't know how [A.M.] was
> getting there, who was bringing her, [or] where she was coming
> from, so I wanted help.

---

[4] Agent Craig's first name is not stated in the testimony.

*Id.* (footnote added).  The Wawa store was located within a couple of blocks from the car rental business -- "within walking distance."  *Id.* at 235.  Sgt. Doyle testified that she arranged for other patrol officers to accompany her in an unmarked vehicle.  *Id.*

Sgt. Doyle testified that at around 1:20 a.m., Agent Craig reported a yellow SUV "pull[ed] out of a residence west of the Wawa within walking distance."  *Id.* at 236.  The SUV traveled along Lancaster Avenue and turned into the Wawa parking lot.  *Id.* at 238.  Sgt. Doyle observed that the SUV parked in a parking space near her unmarked vehicle.  *Id.* at 239.  Two adults emerged from the SUV, then reentered it and pulled out of the parking lot.  *Id.*

The SUV next drove behind the Wawa, at which time Sgt. Doyle observed

> a girl get out of the back of the SUV and she looked upset.  …
> [S]he was dressed inappropriately for the weather.  She had on
> slippers, and then I saw an adult get out of the car, and they
> opened the back [of the SUV], and they were getting out …
> luggage, [including] a suitcase and a couple bags….

*Id.* at 239-40.  Sgt. Doyle testified:

> So I get out of my car, and I'm not in a police uniform or
> anything….  I get out of my car, and [call out A.M.'s name.]  She
> turns, and she looks at me.  I was like, come here.  … [S]he was
> just looking at me.  I grabbed my badge, and I held it up, and I
> [stated], I'm here for your mom, come here, and she did.  She
> came over.  She was crying.  I told her to get in my car because
> it was raining, and I took her things from these people, and I put
> all of her things into my car.  I told her to stay in the car, and I
> quickly realized she didn't understand what I was saying because
> she didn't speak any English.

- 15 -

*Id.* at 240.

When Sgt. Doyle asked the individuals accompanying A.M. for identification, they did not provide the correct information. *Id.* at 241. These individuals stated that they saw A.M. walking along Lancaster Avenue and picked her up. *Id.* at 242.

A.M. subsequently provided officers with two addresses where she had been held involuntarily. *Id.* at 254. Sgt. Doyle cooperated with a Chester County SWAT team and detectives to investigate the two residences. *Id.* at 245. A.M. informed Sgt. Doyle that she was taken "from one to the other [residence] and that there was possibly another girl; at the one where [A.M.] was no longer staying." *Id.* During the course of the investigation, Sgt. Doyle learned that Appellant lived at one of these residences. *Id.* at 262.

A.M. testified that she originally is from Guatemala, and lived there for seven years. N.T., 8/17/22, at 326. A.M. explained that in May 2020, she was 14 years old. *Id.* at 327. According to A.M., before traveling to Pennsylvania, she was living with a friend in Maryland, and her mother lived "close by to where I was living." *Id.* at 328.

A.M. testified that in May 2020, she

was at a hotel with two friends, and they told me that they were going to leave and go get a female friend.

….

So then they got back, and that's how I met [a woman named] Paola.

- 16 -

*Id.* at 328-29.  A.M. went to a party with Paola, Selvin[5] (Paola's boyfriend), and Christian (Selvin's friend).  *Id.* at 329.  After the party, A.M. exchanged Snapchat messages with Paola.  *Id.*  Paola asked A.M. "if I wanted to work." *Id.*  Paola did not identify the type of job to A.M.  *Id.* at 330.  A.M. subsequently told Paola that "yes, I did want to work with her.  And [Paola] said, okay, and that she would come pick me up."  *Id.*

Paola and Rivera-Mendieta, who went by the alias, "Mono," picked A.M. up in Hyattsville, Maryland.  *Id.* at 331; *see also id.* at 367-68 (A.M. identifying Rivera-Mendieta as Mono).  A.M. explained:

> Well, [Paola and Rivera-Mendieta] got there, and then [Paola] went with me to get my things.  [Paola] accompanied me inside. The friend that I was living with there, he went inside.  So I got my things.  He stayed outside.  And then my friend who I had been living with made some [hand] signs at [Paola].  She saw th[e hand signs] and returned them.

*Id.*  According to A.M., she recognized the hand signs as gang signs from the MS-13 gang.  *Id.*  At the time, A.M. was not aware of her friend's gang affiliation.  *Id.* at 331-32.  A.M. testified that Paola returned a gang sign from "the 18th" street gang.  *Id.* at 332.

A.M. testified that after the exchange of hand signs, a fight developed between her friend and Paola, and her friend "went to get a knife."  *Id.*  The fight ended when Rivera-Mendieta left to get the car.  *Id.* at 333.  A.M.

---

[5] Selvin's full name is not specified.

testified that she was taken to a park with Rivera-Mendieta, Selvin and Christian: "They took me into a forest area, and they were hitting me for 16 seconds." *Id.* According to A.M., the men injured her on the side of her leg. *Id.* at 334. Rivera-Mendieta and Paola told A.M. she "could not go home." *Id.* As a result, A.M. testified, "I felt bad. I felt scared, and I wanted to go home." *Id.*

Rivera-Mendieta transported A.M. from Maryland to a residence in Malvern, Pennsylvania. *Id.* at 335. According to A.M., the next day, "we went to buy food at Walmart, and we got there, [Paola] told me to go buy something sexy to wear." *Id.* at 336. A.M. testified, "I told her that I didn't want to do anything like that and that I wanted to go home." *Id.* at 336-37. Paola indicated she would discuss the matter with Rivera-Mendieta. *Id.* at 337. When they returned to Rivera-Mendieta's residence, A.M. testified, "I wrote [a text message] to [the CI] and I told her that I was scared and that if anything happened, she should call the police." *Id.*

A.M. testified that, the same day, Appellant, known to A.M. as "Adonis," described her new "job." *Id.* at 340. According to A.M., Appellant

> took me into the bedroom, and he told me he was going to show me how it was, how I should be, or how I should be with other clients.
>
> …
>
> Well, he took his pants down, and me made me touch his parts….

*Id.* at 340-41. A.M. explained that Appellant made her touch her mouth to his penis. *Id.* at 341. A.M. testified Appellant "told me I had to." *Id.* Thereafter, A.M. and Appellant "had sex in the bed." *Id.* A.M. explained she "was scared because I didn't want to do it, but [Appellant] said I had to do it if I was going to be allowed to go home." *Id.* at 342.

A.M. testified that she sent her friend in Maryland, the CI, a text message, after which Paola "took my phone from me." *Id.* at 338. Paola informed A.M. that A.M. must ask for permission to send her current address to anyone. *Id.* at 339. Paola and Appellant took A.M.'s phone, and forced A.M. to send an audio message to the CI, "to tell her everything was okay and that it had all been a misunderstanding." *Id.* at 343. Afterwards, A.M. told Paola, Rivera-Mendieta, and Appellant that she was 15 years old, although she was only 14 years old at the time. *Id.* at 344.

Rivera-Mendieta subsequently took A.M. to an apartment above a restaurant "to be with a customer." *Id.* at 345. A.M. went upstairs to the apartment, "and the [customer] was waiting for me up there." *Id.* According to A.M. the man paid money to Rivera-Mendieta. *Id.* A.M. described what next transpired:

> I went in and took off my clothes. I took my clothes off. He took
> his clothes off, and he touched my vagina with his penis.
>
> ….
>
> [The customer] didn't say anything to me. He didn't talk to me,
> but [Rivera-Mendieta] – they told me that I had to be with the
> people, but that I shouldn't talk to them.

- 19 -

*Id.* at 346. A.M. went to that apartment twice. *Id.* at 347. According to A.M., she was told that "I had to do it or I wouldn't get to go home quickly." *Id.* However, Rivera-Mendieta and Paola told A.M. she would not be allowed to go home. *Id.* at 344. Afterwards, A.M. was told to bathe, because "we were going to see two more customers." *Id.* at 346.

Rivera-Mendieta and Paola took A.M. to a house to see two other clients. *Id.* While there, A.M. met with a man and a woman. *Id.* at 348. The three went into a bedroom, where A.M. "put my mouth on the woman's vagina[,]" and the man "touched me all over my chest." *Id.*

A.M. testified that she subsequently lived at that house with two men named Humberto and Sanchez.[6] *Id.* at 349. A.M. explained that clients came to the residence every day. *Id.* at 355. According to A.M., in total, she interacted with five or six clients. *Id.* Each had to pay Sanchez. *Id.* Further, A.M. had to give any tips she received to Sanchez. *Id.* at 358. A.M. was told to tell clients that she is 22 years old and that her name is "Daniella." *Id.* at 355.

A.M. also testified regarding her use of a tablet computer. A.M. explained that she went into the bedroom of Humberto, to use his tablet. *Id.* A.M. explained that she had requested help from Humberto, and told him she was "being forced to be there." *Id.* A.M. asked Humberto for his assistance

_____

[6] Sanchez, after entering a guilty plea, testified at trial.

to contact her mother. *Id.* Humberto "told me not right now, but that another day he could help me with that." *Id.* Humberto later loaned his tablet to A.M. to message her mother. *Id.* at 361. A.M. told her mother, "I didn't want to be here anymore." *Id.* Humberto also told A.M. he would buy her a telephone, "and leave it in a piece of furniture in his bedroom for me." *Id.* A.M. later contacted her mother using the telephone provided by Humberto. *Id.* However, when Rivera-Mendieta observed A.M. leaving Humberto's bedroom, he struck A.M. in the eye with his fist. *Id.* at 360.

A.M. testified that she and Humberto subsequently planned for A.M.'s escape:

> [Humberto] told me that the next day, he would go buy us all beers, and he was going to get everyone together there and that I should take advantage of that to escape.
>
> ….
>
> He told me to go out through his bedroom window.

*Id.* at 361-62. Humberto purchased beer the next day, at which time A.M. attempted to escape. *Id.* at 362. A.M. testified:

> I saw that everyone was in the living room, so I went into Humberto's bedroom. I grabbed the phone, and I went out through his bedroom window.
>
> ….
>
> I took off running, and when I turned around to look, I saw that [Rivera-Mendieta] was behind me.
>
> ….

… [Rivera-Mendieta] told me that I had to go back, that I wasn't allowed to leave. So I went back in through the window that I went out of because I thought he could take me somewhere else.

*Id.* A.M. testified she feared Rivera-Mendieta would move her to another location. *Id.* at 363.

Upon returning through the window, A.M. "asked Humberto to call the police. And he said, no, it would be better if I told everyone who was there the truth." *Id.* Humberto called Sanchez and two clients into the bathroom, at which time A.M. told them she was forced to be there and wanted to go home. *Id.* The clients assisted A.M. with her suitcases and drove her to the Wawa store described above. *Id.* at 364. A.M. thought her mother would be at the Wawa waiting for her. *Id.* at 365.

A.M. testified that Rivera-Mendieta had threatened A.M. not to tell clients of her circumstances, as they would report it back to him. *Id.* at 364. A.M. also testified that Rivera-Mendieta once forced her to perform sex acts with Humberto. *Id.* at 364-65. A.M. indicated that Rivera-Mendieta once touched her vagina with his penis. *Id.* at 364-65. A.M. also testified that Rivera-Mendieta "told me there was … another girl" working for him. *Id.* at 366. That other girl "was at the first apartment where I had been." *Id.*

A.M. testified that Paola and Rivera-Mendieta took pictures of her with a telephone. *Id.* at 366-67. In those photos, A.M. wore only her underwear. *Id.* at 367. A.M. further testified that Rivera-Mendieta "told me once that if I wanted to go back to Maryland, I'd have to kill my friend because he was a

member of MS-13." ***Id.*** A.M. was told that if she joined the 18th Street gang, she would be allowed to leave. ***Id.*** at 383. A.M. was also told "I couldn't go home and that I should not try to escape." ***Id.*** at 389.

The Commonwealth also presented the testimony of E.A., another victim, who was born in November 2001. ***Id.*** at 391. E.A. testified that when she was 17 years old, she moved to the United States from El Salvador. ***Id.*** E.A. explained she moved in with her father, who was living in Virginia. ***Id.*** at 392.

E.A. testified that in 2020, she spoke with a friend named Kimberly through the application, Snapchat. ***Id.*** at 393. Kimberly stated she could help E.A. find work. ***Id.*** E.A. thereafter spoke with Appellant on Snapchat. ***Id.*** at 394. According to E.A., "we started talking about the work, which was going to be working in a bar, and [Appellant] also talked about a massage parlor." ***Id.*** At that time, E.A. did not have papers to work legally in the United States. ***Id.*** Although E.A. had requested a week to get her "affairs in order[,]" Appellant sent someone to pick her up the next day. ***Id.*** at 395. Appellant indicated that he "had everything all prepared. Like he had apartments where there were rooms that I could rent while I was going to work." ***Id.***

E.A. testified that Rivera-Mendieta and Sanchez picked her up and, on February 17, 2020, transported her out of Virginia. ***Id.*** at 399. They took E.A. to an apartment "where they sell cars[.]" ***Id.*** E.A. stated she waited at

the apartment with Sanchez and another man. *Id.* at 400. According to E.A., she waited for Appellant to arrive. *Id.* Appellant subsequently took E.A. shopping "to buy condoms and lube." *Id.* at 403. After leaving the store, Appellant took E.A. to a hotel "to show me what the job was, what I had to do." *Id.* at 404.

At the hotel, Appellant and E.A. began smoking marijuana. *Id.* at 405. Appellant told E.A. to smoke a small, white rock "so that I could be able to speak well with him about what I was going to have to do." *Id.* E.A. testified, "[h]e said that he was going to show me what I was going to have to do with the clients." *Id.* Appellant then "started to get naked." *Id.* at 406. Appellant told E.A. to remove her clothing. *Id.* When asked why she complied, E.A. testified it was

> because I was just one person there with him. I didn't know what he might have on him. He always used to say that he would carry. He used to say that he was equipped. I didn't know what that meant. I didn't know if equipped meant that he carried a weapon or what. I didn't know.

*Id.*

Appellant then engaged in involuntary sexual intercourse with E.A. *Id.* at 407. E.A. stated, "I told him … that I didn't want to." *Id.* Appellant penetrated E.A.'s vagina with his penis. *Id.* According to E.A., Appellant responded, "I have to show you how because if I don't, then the clients could hurt you." *Id.* This scared E.A. *Id.*

Appellant also forced E.A. to have oral sex with him. *Id.* E.A. testified this was not the type of work that she had agreed to perform in Pennsylvania. *Id.* at 408.

Appellant brought E.A. back to the apartment. *Id.* E.A. testified that she began seeing "clients" the next day. *Id.* at 409. She sometimes saw clients at the apartment. E.A. testified that

clients would send [Sanchez] a message that they were outside. They would come and wait at the door by the bathroom, and then he would give them a ticket, and they would come in.

….

The ticket just had a time set limit on it, like 10 minutes, 20 minutes, 30 minutes, 40 minutes.

*Id.* at 416, 417. E.A. explained that the tickets were for sex with her. *Id.* at 420. Sanchez would keep track of the time and collect money from the clients. *Id.* at 417. According to E.A., when Appellant "wasn't around, [Rivera-Mendieta] would take me." *Id.* at 421. E.A. testified that clients did not come to the apartment every day. *Id.* at 422. However, there would sometimes be ten or twelve clients at the apartment on a given day. *Id.* She also was taken to other apartments to meet with clients. *Id.* According to E.A., "some clients wanted us to go to their house." *Id.* at 417. E.A. received no money for her work. *Id.* at 423. E.A. stated that, when she was taken to other apartments to see clients, she would take the tickets from the clients. *Id.* E.A. would give the tickets to Appellant, "[s]o that he would count them and see what the total was." *Id.* According to E.A., Appellant "would come, …

like every Friday. So when we would go by, he would come and get the tickets and the money." *Id.*

E.A. expressly told Appellant she did not want to engage in sexual activities, but Appellant replied, "You're already here; you're under my power." *Id.* at 418. E.A. explained: "So I was in a place where I didn't know anyone, and I was there with [Appellant], and so I couldn't go to another place." *Id.* E.A. testified that Appellant told E.A. he was a member of the 18th Street gang. *Id.* at 418-19. E.A. testified that Appellant "told me he would be able to find me anywhere in the country." *Id.* at 418. E.A. believed that Appellant could harm her or members of her family, who had remained in El Salvador, with one phone call. *Id.* at 420. Appellant also retained E.A.'s immigration paperwork. *Id.* at 426. E.A. stated she was not permitted to leave the apartment on her own. *Id.* at 427.

E.A. testified that Appellant took her to a hotel and made her have sexual intercourse with him every day. *Id.* at 424. E.A. explained, Appellant "would tell me he wanted to teach me new things so that I could keep the clients happy." *Id.* Appellant would put his penis in her vagina, and "hit me in the face with his penis." *Id.* at 425. E.A. stated Appellant "would put his penis in my mouth, in my anus, in my vagina." *Id.* E.A. stated she did not wish to have sex with Appellant. *Id.* E.A. stated that every day, she asked Appellant if she could leave; Appellant replied, no. *Id.* at 433.

E.A. also testified that Sanchez took naked photos of her to use for advertising her sexual services. *Id.* at 431. At one point, E.A. told Sanchez's friend, Raul, about her circumstances. *Id.* at 429. Raul offered to help E.A. *Id.* Raul bought alcohol "to get [Sanchez] and [Rivera-Mendieta] drunk[,]" after which they left the apartment. *Id.* at 430. E.A. and Raul went to Raul's house. *Id.* Appellant eventually came to Raul's house and demanded $1,000 for taking E.A. from the apartment. *Id.* According to E.A., Appellant came to Raul's house almost every day to demand E.A.'s return or payment. *Id.* at 430-31.

Sanchez, who previously had entered a guilty plea, also testified at trial. N.T., 9/18/22, at 620. Sanchez testified that he and Appellant both lived at 483 Lancaster Avenue. *Id.* at 620. Appellant lived in the basement. *Id.* Sanchez testified that he granted Appellant's request to have E.A. stay with him. *Id.* at 621. Sanchez stated, when E.A. came to the apartment, "[s]he went straight to the bathroom to shower." *Id.* Afterwards, E.A. left with Appellant. *Id.* Sanchez later learned that Appellant had taken E.A. to a hotel. *Id.* According to Sanchez, Appellant admitted to having sex with E.A. *Id.* at 622. Sanchez stated that, "[a] few hours later[, Appellant] said that [E.A.] would be working as a prostitute." *Id.* Sanchez confirmed E.A. was present when Appellant said this. *Id.*

Thereafter, Sanchez began promoting E.A.'s services as a prostitute. *Id.* He stated, "I put her several times on Snapchat." *Id.* Clients came to

the apartment to have sex with E.A. *Id.* Sanchez explained he would "collect the money and record the time[]" on his telephone. *Id.* at 622-23. Sometimes, clients brought "a ticket" to hand to E.A. *Id.* at 623. Afterwards, E.A. would give the ticket to Appellant. *Id.* Sanchez performed these activities instead of paying rent. *Id.* Eventually, E.A. left the apartment to live with Raul. *Id.* at 626. This worried Sanchez, "[b]ecause I think that [Appellant] didn't know that [E.A.] was planning to leave with Raul." *Id.* Sanchez confirmed that he was also worried for himself:

> Because the majority of the time, it was me that was home with [E.A.], and I thought that probably [Appellant] will blame me to allow one of my friends to come to my house and become friends with her.

*Id.* Sanchez admitted he was supposed to be watching E.A. to make sure she did not leave the apartment. *Id.* at 626-27.

Sanchez testified that he eventually moved out of the apartment because he feared for his life:

> I had these thoughts in my mind because of the crack. I thought they wanted to keep everything that was in the apartment and probably kill me [in] order to keep everything that was in the apartment. Those were the thoughts in my mind.

*Id.* at 630.

Sanchez also testified regarding another girl who was brought to the apartment. *Id.* at 631. Paolo and Rivera-Mendieta came to Sanchez's apartment, which was located near the car dealership. *Id.* While there, Rivera-Mendieta showed Sanchez photos of A.M., who was depicted lying on

a bed wearing only underwear.  *Id.*  Sanchez subsequently used the photos to advertise A.M.'s services as a prostitute.  *Id.* at 632.

Later, Appellant talked with a man and a woman, "Diana" and "Gordo." *Id.*  According to Sanchez, Diana and Gordo asked Appellant how much he would charge for both of them to have sex with A.M.  *Id.*  One other client visited A.M. at that apartment.  *Id.* at 633.  Sanchez accepted payment from that client, and then gave it to Rivera-Mendieta the next day.  *Id.*  Sanchez further testified that Appellant had warned him

> never to leave [Sanchez's] cell phone unattended to always keep it with me because [A.M.] could use it, and that she was not allowed to use it at that moment ….

*Id.* at 640.

Upon review of the above-summarized evidence, in a light most favorable to the Commonwealth, we agree with Counsel's assessment that the evidence is sufficient to sustain each of Appellant's convictions beyond a reasonable doubt.  We further agree with Counsel's assessment that such a challenge would be frivolous.

The above-stated evidence is sufficient to establish Appellant committed two counts of involuntary servitude, by subjecting A.M. and E.A. to sexual servitude.  *See* 18 Pa.C.S.A. § 3012(a).  The evidence further established Appellant committed two counts of IDSI by twice engaging in involuntary deviate sexual intercourse with E.A.  *See id.* § 3012(a)(1).  The evidence

established Appellant sexually assaulted E.A. on two occasions. *See id.* § 3124.1.

The evidence is further sufficient to sustain Appellant's conviction for terroristic threats, as Appellant twice "communicated … a threat to … commit [a] crime of violence with intent to terrorize another[.]" *Id.* § 2706(a)(1). Regarding corrupt organizations, the evidence established Appellant engaged in a pattern of racketeering activity, by trafficking E.A. for involuntary sexual servitude. *See id.* § 911(b)(3), (h)(1). Appellant engaged in the trafficking of A.M., an individual and a minor, and subjecting her to sexual servitude. *See id.* § 3011(a)(1), (b)(1)-(2).

The evidence sufficiently established Appellant conspired with Sanchez and Rivera-Mendieta to secure the involuntary servitude of both A.M. and E.A. *See id.* § 3012(a). The evidence established that Appellant committed the crime of rape by forcible compulsion. *See id.* § 3121(a)(1). The evidence established Appellant participated as a conspirator/accomplice in the kidnapping of A.M., a minor. *See id.* § 2901(a)(2), (a.1)(2). The evidence is sufficient to establish Appellant knowingly held E.A. in a condition of involuntary servitude (unlawful restraint). *See id.* § 2902(a)(2). Appellant also unlawfully restrained A.M., a minor. *See id.* § 2902(b)(2). Finally, the evidence established Appellant sexually exploited A.M. *See id.* § 6320(a).

Regarding Appellant's challenge to the weight of the evidence, we review a trial court's ruling on such a challenge for an abuse of

discretion. ***Commonwealth v. Banniger***, 303 A.3d 1085, 1095 (Pa. Super. 2023).

> The weight given to trial evidence is a choice for the factfinder. If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.
>
> When a trial court denies a weight-of-the-evidence motion, and when an appellant then appeals that ruling to this Court, our review is limited. It is important to understand we do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.
>
> Moreover, when evaluating a trial court's ruling, we keep in mind that an abuse of discretion is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law. By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record.

***Id.*** (citation omitted).

Upon review of the above-described evidence, we discern no abuse of the trial court's discretion in denying Appellant's post-sentence motion challenging the weight of the evidence. Such a challenge on appeal would lack merit and be frivolous, in light of the extensive evidence of Appellant's guilt presented at trial.

Appellant further challenges the discretionary aspects of his sentence. Prior to reaching the merits of a discretionary sentencing issue,

[w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* [Pa.R.Crim.P. 720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006) (some citations omitted).

Here, Appellant was permitted to file a *nunc pro tunc* appeal of his judgment of sentence. Appellant preserved his issue in a post-sentence motion. The *Anders* brief does not include a Pa.R.A.P. 2119(f) statement. We will nevertheless ignore this defect. *See Commonwealth v. Lilley*, 978 A.2d 995, 998 (Pa. Super. 2009) (declining to find waiver of a discretionary sentencing claim "in light of [c]ounsel's petition to withdraw," even though the *Anders* brief contained a deficient Rule 2119(f) statement). Finally, Appellant's challenge to his sentence as manifestly excessive raises a substantial question that his sentence is inappropriate under the Sentencing Code. *See Commonwealth v. Mouzon*, 812 A.2d 617, 624 (Pa. 2002) (stating that a claim that a sentence is excessive, even if it is within the statutory limits, can raise a substantial question for appellate review).

For challenges to the discretionary aspects of a sentence, we employ a well-settled set of precepts:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse

of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 731 (Pa. Super. 2015) (citation omitted). Moreover, where, as here, the trial court sentenced within the guidelines, such as in the present matter, we may only vacate the sentence if it is "clearly unreasonable." 42 Pa.C.S.A. § 9781(c)(2).

A sentencing court is to consider the protection of the public, the gravity of the offense as it relates to the impact on the victim and the community, and the rehabilitative needs of the defendant. *See id.* § 9721(b). On appeal, this Court is required to, *inter alia*, glean the nature and circumstances of the offenses and history and characteristics of the defendant as well as take note of the opportunities that the sentencing court had to observe the defendant, specifically in contemplation of it having reviewed a pre-sentence investigation. *See id.* § 9781(d).

Here, the trial court considered the appropriate sentencing factors, and had the benefit of a presentence investigation report. Where the sentencing court had the benefit of a presentence investigation report, the law presumes the court was aware of and weighed relevant information regarding a defendant's character along with mitigating statutory factors. *Commonwealth v. Tirado*, 870 A.2d 362, 366 n.6 (Pa. Super. 2005). The

sentence is not manifestly unreasonable, given Appellant's actions and the nature and extent of the criminal enterprise. **See** 42 Pa.C.S.A. § 9781(c)(2).

Finally, our independent review discloses no non-frivolous issues that could be raised by Appellant. Accordingly, we grant Counsel's petition to withdraw, and affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>11/19/2024</u>